**BASF WYANDOTTE CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 82–03–00363.**

United States Court of
International Trade.

Decided Sept. 21, 1987.

Barnes, Richardson & Colburn, James S. O'Kelly, New York City, for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Susan Handler–Menahem, Civ. Div. U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

RESTANI, Judge:

This matter is before the court for decision following trial on June 23 and 24, 1987. The basic issue is whether imported merchandise marketed under the trade name "Bafixans" are inks or dyes for tariff purposes. The merchandise was imported between 1979 and 1981. Depending on the date of importation, the merchandise was classified by the United States Customs Service (Customs) under either item 406.50 of the Tariff Schedules of the United States (TSUS) or items 409.90–92, TSUS.

Item 406.50, TSUS (1980) reads as follows:

> Color, dyes and stains (except toner), whether soluable or not in water, obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part [part 1].

Part 1 of Schedule 4 of TSUS is entitled "BENZENOID CHEMICALS AND PRODUCTS." Subpart A is entitled "Organic Chemical Crude." Subpart B is entitled "Industrial Inorganic Crude." There is no dispute that the merchandise at issue is derived from products provided for in one of the relevant subparts of part 1.

After July 1, 1980, item 406.50 was eliminated from the TSUS, and Bafixans were classified under items 409.90–92, TSUS which added to the above quoted language of item 406.50, the additional words:

> Other:
> 409.90 Products provided for in the Chemical Appendix to the Tariff Schedules.
> 409.92 Other.

Plaintiff argues that Bafixans are not dyes and may not be classified under either item 406.50 or items 409.90–92 as dyes, but rather that they are inks and should be classified under item 474.26 in part 9 of Schedule 4, TSUS. Headnote 1 to Part 9 indicates that products classifiable under both Parts 1 and 9 should be classified under Part 1 except for "... inks". Item 474.26, TSUS (1980) reads:

Inks and ink powders:

\* \* \* \* \* \*

Other inks

Defendant makes two responses: 1) As a factual matter Bafixans are dyes and 2) even if they are actually inks, Congress has manifested an intent that they be classified as dyes. The following are separate discussions of these issues.

## RATIFICATION OF PREVIOUS PRACTICE

Defendant argues that if Customs' previous practice of classification of Bafixans under item 406.50 was erroneous, such practice has been ratified by Congress through the Trade Agreements Act of 1979, Pub.L. No. 96–39, 93 Stat. 144 (1979) (Act). As of July 1, 1980, American Selling Price (ASP) valuation of products classified under item 406.50 was repealed by § 201(b) of the Act. *See* headnote 4 of Part 1, Schedule 4, TSUS (1980) (repealed by § 223(d) of the Act). Defendant cites to various excerpts from the legislative history of the Act, most notably S.Rep. No. 249, 96th Cong., 1st Sess. 126–27, *reprinted in* 1979 U.S. Code Cong. & Admin.News 381, 512–513, which reads in part:

> The bill.—Sections 222 and 223 would convert the rate of duty applicable to certain articles in the TSUS which are on the Final List or are valued on an ASP basis to a rate providing equivalent duty receipts if the article were valued not under existing section 402a or on an ASP basis, but rather on the basis of the existing section 402 of the Tariff Act of 1930.
>
> . . . . .
>
> The nomenclature and rates of duty contained in sections 222 and 223 for merchandise currently subject to the ASP method of valuation and for certain merchandise currently subject to valuation under section 402a are designed to insure that U.S. industries producing the merchandise in question will receive protection under that nomenclature and rates of duty that is substantially equivalent to the protection they receive from present

rates of duty applied on appraised value determined under present U.S. law.

Defendant cites similar language in H.R. Rep. No. 317, 96th Cong. 1st Sess. 88, 94–95 (1979).

Other provisions of the Act, notably sections 224, 225 and 503(a), allowed the President, in order to meet international commitments, to promulgate changes to the tariff schedules that would lower duties on some products. Section 503(a), in particular, allowed products otherwise classifiable under, *inter alia*, item 409.90 to receive duty rate reductions that would have violated previous statutory limits on such reductions, provided the products were not imported into the United States prior to January 1, 1978 and not produced in the United States before May 1, 1978.

Pursuant to such authority the President did alter the tariff schedules and did issue a list of certain products, imported prior to January 1, 1978 or produced in the United States prior to May 1, 1978, which comprise the Chemical Appendix to the Tariff Schedules. Proclamation No. 4768, 45 Fed.Reg. 45135, (June 28, 1980), *reprinted in* 1980 U.S.Code Cong. and Admin.News 7434. Accordingly, the scope of item 409.90 was limited to dyes listed in the Chemical Appendix, and the remaining dyes, not listed in the Appendix and thereby excluded from 409.90, were to be classified under item 409.92. *See id.*

The Proclamation itself and Annex II thereto, which contains the Chemical Appendix, make no mention of any desire to affect principles governing the classification of dyes and inks. Nor is there any language in the legislation or the legislative history cited by defendant which indicates that Congress intended the President to make such a change. The Chemical Appendix, which was published after the enactment of the Trade Agreements Act of 1979, merely lists the relevant chemicals that were imported into the United States before 1978 (or produced here prior to May 1, 1978). Apparently some Bafixans are listed there because they were previously classified by Customs under item 406.50, not because any decision was made that

they are properly classifiable as dyes. Presumably, if the product is not a dye it is not in the competitive position which Congress intended to affect by the legislation discussed here. Only if Bafixans are listed in the Chemical Appendix and they also meet the definition of dyes may they be classified under item 409.90, TSUS. If a particular Bafixan is not listed in the Chemical Appendix it may be classified under 409.92, TSUS, only if it is also a dye.

### INKS VERSUS DYES

The facts stipulated by counsel before trial and the testimony at trial revealed the following about Bafixans: Bafixans consist of highly concentrated coloring agents, dispersing agents which also serve as binders, other chemicals (such as preservatives), and water. Bafixans were invented in recent years for use in the textile industry. Specifically, Bafixans are designed for and are sold to companies who print transfer paper with the Bafixans. The transfer paper is used in a subsequent heat transfer process whereby the coloring in the Bafixans gasifies (sublimes) and is imparted to textiles. Bafixans are relatively expensive when compared with ordinary inks and dyes. Bafixans are not used for direct dying of textiles, although one can dye textiles with them if one wishes to expend money unnecessarily. There was no testimony, however, that the resulting degree of color achieved by dyeing directly with Bafixans or the color fastness achieved by such a process was commercially acceptable. Similarly, although Bafixans are not used to print ordinary paper, because less expensive products are available for this purpose, one may print ordinary paper with Bafixans after adding a sufficient amount of water.

As the type of heat transfer of colorant from paper to textiles at issue here is a fairly recent process, it does not appear to have been specifically contemplated by the drafters of the TSUS. Nonetheless, as is usual in tariff classification, if Bafixans fit the definition of either inks or dyes they will be classified as such.

There was little testimony as to what constitutes a dye. Defendant's one witness testified that he treated the Bafixans as dyes for ASP purposes, but he did not appear qualified to provide a useful definition distinguishing inks from dyes and he did not attempt to do so. Defendant's case basically rests on two types of evidence tending to demonstrate that Bafixans are known as "dyes" to the relevant industry. It is absolutely indisputable that the manufacturer has referred to Bafixans as dyes. The court is not persuaded by such evidence, however, that Bafixans are indeed dyes. Bafixans are sold to the textile industry and "dye" is the word used by that industry. Witnesses testified that when people with a printing industry background use Bafixans they often call them inks. Similarly, the Color Index, an excerpt from which was placed in evidence, lists Bafixans as "Disperse dyes for aqueous printing of dry heat transfer printing papers." This somewhat qualified description of Bafixans, standing alone without any testimony as to why Bafixans are listed in this manner, is not very persuasive.

The most persuasive witness in the case was Mr. Harvey George, Director of the Gravure Technical Association. Mr. George was well-qualified to give his opinion that the merchandise was ink. He testified that Bafixans contain all of the components of ink and function as ink would in a press designed to print with ink, as he confirmed through experiment. The government argues that because a great deal of water is added before Bafixans are press-ready for use, in the type of ordinary printing that Mr. George performed and in transfer printing, that Bafixans cannot be inks. This argument fails in light of *Corporation Sublistatica, S.A. v. United States*, 1 CIT 120, 511 F.Supp. 805 (1981). In that case, ink powders that are also used to print transfer paper, were classified by Customs as dyes. The court found that dyes are colorants and that inks contain colorants, binders and solvents.[1] In the

---

1. Mr. George utilized this definition in his testimony and recognized it as a long-standing printing industry definition.

*Sublistatica* case the non-water solvent was missing from the ink powder. The court found that the product would be classified as an unfinished ink, rather than a dye, but for the existence of a specific provision for ink powder. The total absence of solvent did not persuade the court in *Sublistatica* that the merchandise was a dye. Nor does the absence of *some* solvent here convince the court that Bafixans are dyes.[2] Furthermore, Mr. George testified that water is often added to make press-ready inks for ordinary printing purposes. He referred to Bafixans as "bulk" or "virgin" inks. The court is reluctant to base classification on the mere addition of water by the simple process of stirring or shaking unless the TSUS or legislative history makes clear that such a distinction is intended. There is no such indication here.

Next, defendant argues that the dispersing agents which have binding properties are not "binders." Defendant presented no testimony that ingredients which perform binding and dispersing functions are not binders. Dr. Manfred Gaeng, who was well-versed in the technology of the composition of Bafixans and the properties of the component products, testified that the particular dispersing agents used in Bafixans were chosen for their particular binding qualities. In the process involved here the colors must be bound to the paper, but they must also be capable of leaving the paper and transferring to the textile. Too strong a bond would not be desirable. Mr. George testified, however, that in his experiment the color was bound to the paper in much the same degree that is achieved by using ordinary ink. There was also testimony that, after the heat transfer process is complete, some color remains bound to the paper and the transfer paper is then sold as wrapping paper.

■ Next, defendant points to testimony which demonstrates that thickeners are usually added when Bafixans are used to print transfer paper. The thickeners have binding properties, but by itself the addi-

tion of "more binder" does not prevent Bafixans from being inks. It was also asserted, however, that the amount of binders present in Bafixans distinguishes this case from *Sublistatica*. Approximately 25% of the ink powder in *Sublistatica* was binder. If water is excluded, for comparison purposes with the dry ink powder of *Sublistatica*, the dispersing-binding agent on average comprises approximately 10% of the Bafixan. The defendant presented no credible testimony which would cause the court to conclude that this percentage difference distinguishes Bafixans from the *Sublistatica* product. To the contrary, the court is persuaded by the testimony presented that Bafixans contain sufficient binder and solvent to be ink under the *Sublistatica* and the printing industry definition of ink.

■ There was some additional testimony which supports a finding that Bafixans are not simply disperse dyes. For example, the colorant in Bafixans is milled to a finer consistency than that of ordinary disperse dyes. In addition, Bafixans are non-ionic, while ordinary textile dyes are more commonly anionic.

As announced at the conclusion of trial, the court finds many of the issues in this case were settled in *Sublistatica* and that the testimony of plaintiff's witnesses overwhelmed the documentary evidence of trade description which defendant was able to uncover. Although Bafixans do not fit easily into ordinary notions of either dyes or inks, the testimony clearly established that Bafixans fit the relevant industry definition of ink and perform as inks do.

Accordingly, judgment is entered for plaintiff.

**JUDGMENT**

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision,

2. *Sublistatica* also disposes of any argument that a product is a dye simply because its ultimate purpose is to color textiles.

**IT IS HEREBY ORDERED:** that the merchandise imported under cover of the entries that are the subject of this action is correctly classifiable under item 474.26, TSUS; and it is

**FURTHER ORDERED:** that the United States Customs Service reliquidate the aforesaid entries under item 474.26, TSUS, and shall refund any excess duties paid, together with interest, as provided by law.