Slip Op. 01-134

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                      :
CIBA-GEIGY CORPORATION,               :
                                      :
            Plaintiff,                :
                                      :
                                      :    Before: WALLACH, Judge
      v.                              :    Consol. Court No.: 93-03-00148
                                      :
UNITED STATES,                        :
                                      :
            Defendant.                :
                                      :
_____:

[Defendant's motion for summary judgment GRANTED.]

Decided: November 16, 2001

Ross & Hardies (John B. Pellegrini), for Plaintiff.

Stuart A. Schiffer, Acting Assistant Attorney General; Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, Department of Justice, John J. Mahon, Trial Attorney, for Defendant.

**OPINION**

**WALLACH, Judge.**

**I**

**Preliminary Statement**

Plaintiff, Ciba-Geigy Corporation ("Ciba-Geigy"), sued to challenge the United States Customs Service's refusal to reliquidate certain shipments of "color preparations" imported by Ciba-Geigy. Plaintiff now moves for summary judgment, claiming reliquidation is required,

1

following a timely protest under 19 U.S.C. § 1514, because, allegedly, the Government erroneously classified the subject merchandise under the Harmonized Tariff Schedule of the United States ("HTSUS") (1990) heading 3204, subheadings 3204.12.50, 3204.17.50, 3204.19.19, and that rather, the subject merchandise is properly classified under subheadings 3204.12.40, 3204.17.30, or 3204.19.15.[1] Plaintiff asserts the color preparations, as they are not

---

[1] 3204        Synthetic organic coloring matter, . . .preparations as specified in note 3 to this chapter based on synthetic coloring matter: . . .

* * *

3204.12        Acid dyes, . . ., and preparations based thereon:. . .

* * *

3204.12.40        Other:
            Products described in additional U.S. note 3 to section VI.

3204.12.50        Other.

* * *

3204.17        Pigments and preparations based thereon.

* * *

3204.17.30        Other:
            Products described in additional U.S. note 3 to section VI.

3204.17.50        Other.

3204.19        Other, including mixtures of coloring matter of two or more of the subheadings 3204.11 to 3204.19:

3204.19.15        Other:
            Products described in additional U.S. note 3 to section VI.

3204.19.19        Other.

expressly referenced by the Chemical Appendix to the HTSUS, are therefore necessarily within the ambit of additional U.S. Note 3, Section VI, HTSUS ("Note 3") (1990). As a result, Plaintiff claims the lower tariff classifications should apply. The United States Customs Service ("Customs") has filed a cross motion for summary judgment claiming that the subject color preparations, are listed within the Chemical Appendix by the Chemical Abstract Service registry number ("C.A.S. No.") of the primary color ingredient or via trade name, chemical name, or color index name. As such, Customs avers the higher tariff rates are warranted. Both parties agree the resolution of this matter depends solely on whether the color preparations are described by Note 3, and that this question is purely one of law.

Customs has demonstrated that the subject color preparations are listed within the Chemical Appendix and are therefore not within the ambit of Note 3. Accordingly, the court grants its motion for summary judgment and denies Plaintiff's motion.

## II
### Subject Merchandise

At issue is the proper tariff classification for 56[2] color preparations, each containing

* * *

---

[2] Customs concedes that under its own methodology for determining whether or not a given color preparation is encompassed by Note 3 (i.e. whether the main color ingredient of the preparation is listed within the Chemical Appendix), four of these preparations are properly classified under the lower duty tariff provisions. Therefore there are, in reality, 52 color preparations in dispute. These four preparations are Irgalite Blue GSP, Irgasperse Brown 4R-U, Irgasperse Red G-U, and Microlith Magenta B-WA. See Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and In Support of Defendant's Cross

certain coloring matter that were imported by Plaintiff between February 1990 and October 1992. The preparations are employed in various capacities, including inks, dyes, paints, and stains and are generally composed of one or more color imparting ingredients and one or more non-color ingredients. Products listed in the Chemical Appendix are identified by a C.A.S. No., Color Index Name, trade name, or chemical name.

## III
## Arguments

## A
## Ciba-Geigy Argues that the Plain Language of Note 3 and the De Minimus Rule Support Classification Under the Subheadings that Impose Lower Duty Rates.

Ciba-Geigy claims that the subject color preparations are not listed in the Chemical Appendix and that Customs therefore erroneously classified the preparations under the HTSUS subheadings with higher duty rates. Ciba-Geigy draws the court's attention to Note 3 as the critical distinction between Customs' chosen classification and its own. In summary, Ciba-Geigy states that:

> [c]lassification in the provisions claimed to be correct by plaintiff requires that the merchandise: 1) be synthetic organic coloring matter or preparations based on such coloring matter; 2) be acid dyes, pigments, mixtures of the same, or preparation based thereon; and 3) not be specifically provided for and, therefore, classified in the residual provision, and; 4) be described in Note 3. The classifications asserted by the Customs service have the identical requirements save one; the classifications asserted by the Customs Service require that the preparations be outside Note 3, *i.e.*, they must be listed in the Chemical Appendix.

---

Motion for Summary Judgment ("Defendant's Motion") at 5.

Plaintiff's Memorandum in Support of its Motion for Summary Judgment ("Plaintiff's Motion") at 9.  Customs agrees that this is the primary distinction between the parties' characterization of the color preparations.  See Defendant's Motion.

Note 3 provides:

3.       The term "products described in additional U.S. note 3 to section VI refers to any product not listed in the Chemical Appendix to the Tariff Schedule and–

   (a)    For which the importer furnishes the Chemical Abstracts Service (C.A.S.) registry number and certifies that such registry number is not listed in the Chemical Appendix to the Tariff Schedule; or

   (b)    Which the importer certifies not to have a C.A.S. registry number and not to be listed in the Chemical Appendix to the Tariff Schedule, either under the name used to make Customs entry or under any other name by which it may be known.

U.S. Note 3, Section VI, HTSUS (emphasis added).

Ciba-Geigy claims that the Chemical Appendix cannot refer to a completed preparation by expressly referring to only an *ingredient* within that preparation. Plaintiff's Motion at 2. "Products listed in the Chemical Appendix are identified by a Chemical Abstract Service registry number ('C.A.S. No.'), Colour Index Name, trade name or chemical name.  The vast majority of the products listed in the Chemical Appendix are identified by C.A.S. No.  The subject preparations do not have C.A.S. Nos." Id. at 2 (citing Confidential Appendix A to the Joint Stipulation).  Although "[t]he majority of the subject preparations have as their principal ingredient in terms of function (and in 32 of 56 cases, in terms of relative weight) a pigment or dye whose C.A.S. No. is listed in the Chemical Appendix", id. at 5, "[t]he subject preparations are formulated preparations containing one or more color ingredients and one or more non-color

5

ingredients . . . and since each has non-color ingredients present in significant quantities, which ingredients are not listed in the Chemical Appendix, the Appendix does not cover these preparations." Id. at 2-3. Under this line of reasoning, the subject preparations do not have a specific C.A.S. No. and are therefore not included in the Chemical Appendix.

In support of this argument, Ciba-Geigy asserts that Customs failed to apply the de minimus rule and "classified the subject preparations as being within the scope of the Chemical Appendix by disregarding the presence of the non-listed color and non-color ingredients in the formulations." Id. at 12. Specifically, Plaintiff asserts that the two major principles underlying the de minimus rule dictate that 1) "ingredients which are significant in terms of quantity or function may not be ignored in determining classification" and 2) "the presence of ingredients may be ignored when they are insignificant." Id. (citing Varsity Watch Co. v. United States, 34 CCPA 155 (1947); United States v. Aetna Explosives Co., 256 U.S. 402, 41 S. Ct. 513, 65 L. Ed. 1013 (1921)). Plaintiff avers that each of the subject preparations contains non-color ingredients that perform significant and substantial functions. Secondly, Plaintiff avers that the non-color ingredients are present in significant quantities, "in the case of 24 of the 56 preparations at issue, they are present in quantities greater than the coloring matter." Id. at 17. As such, the alleged non de minimus presence of the non-color ingredients would place all of the subject color preparations outside the Chemical Appendix.

Thus, Ciba-Geigy asserts the relevant inquiry should be whether or not a given color preparation is listed in the Chemical Appendix by C.A.S. number, recognizing the color preparations are completed products that contain a significant array of non-color ingredients. If the answer is no, then Ciba-Geigy asserts that preparation is included within the scope of Note 3

6

and should be liquidated under according to the lower tariff rates.

**B**

**Customs Claims that Plaintiff's Distinction Between "Products" and "Ingredients" Does Not Find Support Within the Chemical Appendix.**

Customs claims that "Ciba-Geigy's focus on 'ingredients' vs. 'products' and its interpretation of the applicability of the de minimus rule are incorrect and their adoption would impermissibly circumscribe the scope of the Appendix and frustrate the intent of the legislature." Defendant's Motion at 9. Customs further claims that "the presence of non-color ingredients, whatever their magnitude or function, has no bearing upon either the classification of coloring matter or whether it is within the scope of the Chemical Appendix." Id. at 9-10.

Customs first relies on the Appendix's legislative history to argue that the subject color preparations are governed by the higher tariff rates and to counter Ciba-Geigy's application of the de minimus rule. Customs says that "[e]xamination of the history and reason for the enactment of the Chemical Appendix demonstrates that Ciba-Geigy's arguments here would impermissibly narrow and circumscribe the intended scope of the Chemical Appendix." Id. at 10. In short, since the United States International Trade Commission ("ITC") established the Chemical Appendix, Customs offers an interpretation of a pair of ITC publications that purport to articulate the scope of the Appendix. From these bulletins, Customs derives critical cutoff dates of January 1, 1978, prior to which the importation of the listed chemicals would trigger the higher tariff rates and May 1, 1978, prior to which the production of the listed chemicals within the United States would trigger the higher tariff rates. Customs concludes that there was "an explicit legislative

7

intent to assess duty at a higher rate on <u>inter</u> <u>alia</u>, the synthetic organic coloring matter classifiable in Heading 3204, HTSUS, unless it was not imported or produced before the applicable dates. . . ." <u>Id.</u> at 15.

Secondly, Customs argues that by insisting that the coloring matter in its products is an ingredient among many other ingredients, Ciba-Geigy inaccurately "marginalizes the important role coloring matter plays in its products." <u>Id.</u> at 20. Customs generally criticizes Ciba-Geigy's reading of the C.A.S. Registry Numbers and the Chemical Appendix for being too narrow and guilty of omission. <u>Id.</u> at 20-25. In particular, Customs claims that the C.A.S. Registry Numbers and their relationship with the Chemical Appendix must be read more broadly and that such reading is consistent with their language. "With respect to coloring matter and preparations based on coloring matter, the C.A.S. Registry Numbers do not only represent the discrete chemical compounds, but also represent all the names by which that coloring matter or preparations based on coloring matter are known, including all trade names." <u>Id.</u> at 20-21. Moreover, Customs emphasizes the Chemical Appendix Note which states that reference to the products by the C.A.S. Registry Number includes such products "by whatever name known." Chemical Appendix Note, HTSUS (1992). The Chemical Appendix Note which is incorporated in the overall HTSUS language, provides:

Chemical Appendix Note

1. This appendix enumerates those chemicals and products which the President has determined were imported into the United States before January 1, 1978, or were produced in the United States before May 1, 1978. For convenience, the listed articles are described (1) by reference to their registry number with the Chemical Abstracts Service (C.A.S.) of the American Chemical Society, where available, or (2) by reference to their common chemical or trade name where the C.A.S. registry number is not available. For the purpose of the tariff schedule,

8

> any reference to a product provided for in this appendix includes such products listed herein, **by whatever name known**.

Id. (emphasis added). Therefore, Customs claims that the Appendix refers "not solely to the chemical compound of the coloring matter represented by the C.A.S. Registry Number," but also the trade names, and the color index names and numbers under which the coloring matter is commercially known. Defendant's Motion at 22.

Finally, Customs stresses that the Chemical Appendix need refer to only the main coloring ingredient of a given preparation by whatever name known for that preparation to be within its ambit. Customs claims "[i]t is undisputed that all of the coloring matter imported here (with the exception of the four earlier identified as to which the Government concedes) are listed in the Chemical Appendix by the C.A.S. Number of the main coloring matter or its Color Index Name and/or Number. It is also undisputed that the main coloring matter determines the product's classification without regard to the presence of other ingredients or their magnitude such as those included in the imported acid dyes, pigments and mixtures in issue here. Moreover it is the **classification** of the product which determines if it is within the scope of the Chemical Appendix in the first instance." Defendant's Motion at 17 (emphasis in original).

In summary, Customs argues for a more inclusive reading of the Chemical Appendix based on the Appendix's legislative history and Customs' past practice. In addition, Customs avers that the relevant inquiry should focus on whether the main coloring ingredient of the subject preparations was imported into or produced within the United States prior to the above critical dates.

**IV**

**Standard For Analysis**

**A**

**Summary Judgment**

Under USCIT R. 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the burden of demonstrating the absence of all genuine issues of material fact. Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988). This may be done by producing evidence showing the lack of any genuine issue of material fact or, where the non-moving party bears the burden of proof at trial, by demonstrating that the nonmovant has failed to make a sufficient showing to establish the existence of an element essential to its case. Id.; Celotex Corp. v. Catrett, 477 U.S. 317, 324-325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

To successfully oppose a properly supported motion for summary judgment, the nonmovant may not simply rest on its pleadings. Rather, it must produce evidence "by affidavits or as otherwise provided in [USCIT R. 56]" which "set forth specific facts showing that there is a genuine issue for trial." USCIT R. 56(e); see also Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987) ("[T]he party opposing summary judgment must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient.").

In determining whether the parties have met their respective burdens, the court does not "weigh the evidence and determine the truth of the matter," but simply determines "whether there

is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 , 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In so doing, the Court views all evidence in a light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962); Avia Group Int'l, 853 F.2d at 1560.


**B**

**The Presumption of Correctness Does not Apply.**


In a classification action, once the court has decided that no material facts are in dispute, it is then left with a purely legal question involving the meaning and scope of the tariff provision and whether it includes the imported merchandise. See National Advanced Sys. v. United States, 26 F.3d 1107, 1109 (Fed. Cir. 1994). Although typically there is a statutory presumption of correctness for Customs decisions, 28 U.S.C. § 2639(a)(1) (1994), when the court is presented with a question of law in a proper motion for summary judgment, that presumption does not apply. See Universal Elecs., Inc. v. United States, 112 F.3d 488, 492 (Fed. Cir. 1997); Goodman Mfg., L.P. v. United States, 69 F.3d 505, 508 (Fed. Cir. 1995) ("Because there was no factual dispute between the parties, the presumption of correctness is not relevant.")


**V**

**Analysis:**

**The Chemical Appendix Cannot be so Narrowly Interpreted as to Bar Reference to a Completed Preparation Based on the Express Listing of the Preparation's Main Ingredient.**


Plaintiff's argument that the Chemical Appendix cannot refer to completed products

11

based solely by the main component ingredient must fail, as it would too severely limit the Appendix's application. Among other things, Plaintiff attacks Customs' construction of the statute on the basis that it would render the Chemical Appendix mostly "superfluous" and that, contrary to the statute's plain language, it expands the ambit of the statute. However, the plain language of the Chemical Appendix itself as well as the history and evidence in support of Customs' position, clearly counters these arguments.

It is clear that the court has a duty to find the correct classification of merchandise. Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984). To accomplish this, the court employs a two-step process: first, construe the relevant tariff classifications; and second, determine under which of the properly construed tariff headings the merchandise at issue falls. Bausch & Lomb Inc. v. United States, 148 F.3d 1363, 1364-66 (Fed. Cir. 1998). The first step in this process is a question of law, while the second step is a factual inquiry. Id. at 1366.

The court must first examine the statutory language to divine the statutory meaning. See United States v. Turkette, 452 U.S. 576, 580, 69 L. Ed. 2d 246, 101 S. Ct. 2524 (1981). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Prod. Safety Comm'n et al. v. GTE Sylvania, Inc., 447 U.S. 102, 108, 64 L. Ed. 2d 766, 100 S. Ct. 2051 (1980). It is assumed that Congress uses the language of commerce in drafting tariff provisions, and such provisions "are to be construed in accordance with their common and popular meaning, in the absence of a contrary legislative intent." E.M. Chemicals v. United States, 920 F.2d 910, 913 (Fed. Cir. 1990) (citations omitted). "To assist it in ascertaining the common meaning of a tariff term, the court may rely upon its own understanding of the terms used, and it may consult lexicographic and scientific authorities,

12

dictionaries, and other reliable information sources." <u>Brookside Veneers, Ltd. v. United States</u>, 847 F.2d 786, 789 (Fed. Cir. 1988) (citations omitted).

In addition, the General Rules of Interpretation ("GRI") of the HTSUS govern the proper classification of merchandise. <u>See</u> <u>Orlando Food Corp. v. United States</u>, 140 F.3d 1437, 1439 (Fed. Cir. 1998). The HTSUS is divided into headings providing general categories of merchandise, which are further divided into more particularized categories by subheadings. <u>Id.</u> In relevant part, GRI 1 provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to [the subordinate GRI's]" (emphasis added).

**A**

**The Chemical Appendix Does Not Refer to Color Preparations Solely by C.A.S. Registry No., but by "Whatever Name Known."**

Since the Chemical Appendix expressly refers to chemicals "by whatever name known", Ciba-Geigy's plain language argument fails to constrain the Chemical Appendix to referring to chemicals solely by C.A.S. No. The Chemical Appendix plainly employs the most inclusive language possible, and moreover, even if the language was ambiguous, the supporting materials and legislative history asserted by Customs clearly demonstrate such inclusiveness.

Ciba-Geigy argues that "[d]efendant's interpretation (that a preparation incorporating an ingredient having a C.A.S. No. listed in the Chemical Appendix is included there) means that preparations with multiple color ingredients, where the principal color is not listed but a second color is, would be within the Chemical Appendix." Plaintiff's Memorandum of Law in Opposition to Defendant's Cross-Motion for Summary Judgment and in Reply to Defendant's

13

Opposition to Plaintiff's Motion for Summary Judgement ("Plaintiff's Response") at 9. Plaintiff maintains that if this were the case it would lead to profoundly absurd results. Specifically, Ciba-Geigy asserts that since, in certain instances, the C.A.S. Registry No. referring to the primary color ingredient of a color preparation and the Color Index Name of the total preparation are both listed in the Chemical Appendix, two "unassailable" points are established: "(1) when the intent was to include a preparation it was named; and (2) the C.A.S. No. of a chemical compound was not intended to cover preparations incorporating the compound." Id. at 8. Hence, Ciba-Geigy inquires "why trade names of preparations are listed if all that is important is the C.A.S. No. of one of their ingredients[?]" Id.

The Chemical Appendix Note itself strongly suggests an answer to this question. It provides that "[f]or the purpose of the tariff schedule, any reference to a product provided for in this appendix includes such products listed herein, **by whatever name known.**" Chemical Appendix Note (emphasis added). This is especially so as the Note also says: "[f]or convenience, the listed articles are described (1) by their registry number with the Chemical Abstract Service (C.A.S.) of the American Chemical Society, where available, or (2) **by reference to their common chemical name or trade name** where the C.A.S. Registry number is not available." Id. (emphasis added). In addition, the language of Note 3, provides that a color preparation falls within its ambit, only if it is not listed within the Chemical Appendix "either under the name used to make Customs entry or under any other name by which it may be known."

Furthermore, Ciba-Geigy's reliance upon Platt v. Union Pac. R. Co., 99 U.S. 48, 58 (1878) and Ameliorex, Inc. v. United States, 565 F. 2d 674 (CCPA 1977), which stand for the

14

proposition that all the words within the statute must be given meaning, as well as <u>Pennsylvania</u> <u>Dep't of Welfare v. Davenport</u>, 495 U.S. 552, 562, 110 S. Ct. 2126, 109 L. Ed. 2d 588 (1990) and <u>Mitsubishi Int'l Corp. v. United States</u>, 182 F.3d 884 (Fed. Cir. 1999), which advise against interpreting a statutory provision in such a fashion as to render superfluous another provision, is misplaced in this context. These cases have little bearing on the current situation where the statutory provisions at issue are in the nature of a list, not a collection of clauses. Unlike a collection of clauses, each with an individual purpose, where an item of a list is interpreted in such a fashion so as to make another item redundant, the overall purpose of the statute is not frustrated. Quite the contrary, a listing of items may be deliberately redundant to be more inclusive. Hence these cases fail to undermine Customs' reading of the Chemical Appendix.

The language above could certainly envision and support instances where a color preparation may be referred to redundantly by either its primary color ingredient or, for example, by the color index name for the entire preparation, to maintain a broad inclusiveness. Moreover, on numerous occasions, Customs clarified that its position is "if the **main** coloring ingredient of an imported product is listed in the Chemical Appendix, then that imported product is described by the Chemical Appendix and is subject to the higher duties intended by Congress." Defendant's Response at 7 (emphasis added). It is, therefore, not at all clear to this court that the plain language of the statute demands a specific pinpoint reference in order for a given color preparation to be listed within the Color Appendix. Indeed, there is nothing to suggest that Customs' practice of asserting certain color preparations are included within the Color Appendix via express reference to the main coloring ingredient runs counter to the broad and inclusive language of the statute. To the contrary, if anything, it appears that the plain language of the

15

statute supports this approach. Therefore, Ciba-Geigy's plain language argument fails.

Moreover, although the relevant HTSUS subheadings, Note 3, and the Chemical Appendix note all refer to "products," that term does not differentiate between an ingredient and some combination of ingredients, and to the extent that the term "product" is ambiguous, the court is guided by the current legislative history and the other supporting material proffered by Customs.[3] Clearly, if the reference to "products" encompassed solely preparations and

_____

[3] Plaintiff, during oral argument, challenged Customs' assertion that the subject language and HTSUS heading 3204 encompass both chemical ingredients and chemical preparations. It argued the assertion is illogical in light of the wording of other chapters in the HTUS, such as chapter 29 which implicates the Chemical Appendix, but contains headings that expressly exclude color preparations. However, in response to the court's order of November 6, 2001 that requested the parties to

> [c]ite any headings or subheadings within the Harmonized Tariff Schedule of the United States ("HTSUS"), other than heading 3204 and its included subheadings, that make a distinction between chemical ingredients and chemical preparations based on those chemical ingredients, and by direct or indirect operation of the Chemical Appendix either 1) specifically exclude chemical preparations or products but include chemical ingredients; or 2) specifically include chemical preparations or products but exclude chemical ingredients[,]

November 6, 2001 Order, Ciba-Geigy stated it "beleive[s] that there are no headings or subheadings which satisfy the Court's request." Plaintiff's Memorandum in Response to the Court's Order of November 6, 2001 at 2.

Nonetheless, even in the absence of Plaintiff's concession, the court is not persuaded by the above argument, given the chapter notes to chapter 32 of the HTSUS which state:

> 1. This chapter does not cover:
>     (a)    Separate chemically defined elements or compounds (except those
>            of heading 3203 or 3204 . . . );
>
>                          * * *
>
> 3. Headings 3203, 3204, 3205 and 3206 apply also to preparations based on coloring matter . . . .

HTSUS, notes, chapter 32 (1990).

combinations of individual chemical compounds, Customs' approach, which asserts that an express reference to a single coloring ingredient in the Chemical Appendix encompasses all color preparations primarily based thereon, would be rendered untenable. Fundamentally, the common meaning of a term may be gleaned from lexicographic authorities. Webster's Third New International Dictionary of the English Language 1810 (1986), defines "product" as: **2a:** something produced by physical labor or intellectual effort . . . . The court finds the term "products" alone does not clarify whether it refers to single ingredients, a combinations of ingredients, or both. The court therefore turns to legislative history and the ITC publications for guidance.

## 1

## The Expansive Nature of the Chemical Appendix is Revealed by the Legislative History and its Underlying Purpose to Protect Domestic Industry.

Customs bases the thrust of its arguments on the legislative history and the enforcement history of the Chemical Appendix itself. This history demonstrates the Appendix was designed to enumerate those chemicals that were imported during a given period prior to the establishment of the Trade Agreements Act of 1979 ("the Act"), P.L. 96-39, Title II, Subtitle B, Section 223, Subsection (d). As such, Customs avers the Appendix serves to identify the chemicals governed by the older framework and the attendant higher tariff rates.

Customs claims that the Chemical Appendix is an outgrowth of the Act, which maintained tariff rates for "certain benzenoid chemicals and their products which at that time

were subject to the American Selling Price (ASP) method of valuation." Defendant's Motion at 10 (citing 19 U.S.C. § 1041a(e)). The Act, although phasing out the ASP itself, preserved its valuation methodology, as the accompanying Senate Report explains "'[t]he duty increases have been computed to provide for the collection of the same amount of duty on those products as is currently collected under ASP.'" Id. at 10 (quoting Senate Report No. 96-249, 168, reprinted in 1979 U.S.C.C.A.N. 381, 554). However, the President, through Title V, Section 503(a) of the Act, was authorized to lower tariff rates for chemical products outside this subset, provided these products were neither imported into the United States before January 1, 1978 or produced in the United States prior to May 1, 1978. Therefore the Appendix was created to identify the benzenoid chemicals and products imported into the United States prior to the above period to be subjected to the higher ASP duty rates. Customs also contends that the subject color preparations "had been subjected to the ASP method of valuation and now, under the HTSUS, would be subjected to the higher duty rate." Id. at 11.

The ITC originally established the Appendix, and USITC Publication 1073 and 1074 clarify the Appendix's scope and operation. See Chemicals and Products Provided for in the Chemical Appendix to the Tariff Schedules of the United States, USITC Publication 1073 and 1074 (1980) ("the Publications").[4] The relevant portion of USITC Publication 1073 provides:

---

[4] USITC Publication 1073 is footnoted at the title of the Chemical Appendix as follows:

1/ Most of the products listed in the Chemical Appendix are identified only by the applicable Chemical Abstracts Service (C.A.S.) registry number. The C.A.S. registry numbers applicable to imported chemicals and products may be obtained from USITC Publication 1073 - Chemical Appendix to the Tariff Schedules of the United States.

<u>Introduction</u>

<u>Historical Background</u>

During the multilateral Trade Negotiations concluded in 1979 under the auspices of the General Agreements on Tariffs and Trade, the United States agreed to apply more favorable duty treatment to certain chemicals, classifiable in 47 specific basket categories of the Tariff Schedules of the United States (TSUS), if those chemicals were of a type which had neither been imported into the United States before January 1, 1978, nor produced in the United States before May 1, 1978.

In order to make the determinations necessary to implement these concessions the President requested the United States International Trade Commission (USITC) to prepare a list of those chemicals in the 47 categories which had been imported, or produced in the United States, before the stipulated dates.

**This list was prepared by the USITC and submitted to the President. Pursuant to Presidential Proclamation, this list of chemicals and products will be made the Chemical Appendix to the Tariff Schedules of the United States** and the 47 categories subject to concession will be divided into new TSUS provisions which read:

"Products provided for in the Chemical Appendix to the Tariff Schedules"

and

"Other"

Products classifiable in one of these 47 provisions for "Other," receive the more favorable duty treatment agreed to in the MTN.

<u>Purpose of this publication</u>

Most of the products listed in the new Chemical Appendix are identified only by the applicable Chemical Abstracts Service (C.A.S.) registry number. **However, any single chemical frequently moves in commerce under a number of different names, including trade names. Consequently to facilitate the determination of the CAS registry numbers applicable to <u>imported chemicals and products</u> classifiable in the TSUS items listed below [the tariff provisions which provide for "products provided for in the Chemical Appendix to the Tariff**

**Schedules"], this alphabetical listing which enumerates these chemicals and products by reference to their CAS name <u>and other known chemical names and trade names, as well as their registry number, was prepared</u>** –

USITC Publication 1073 at 1-2 (emphasis added) (footnote omitted).

The above elucidates the "by whatever name known" language of the Chemical Appendix Note. Specifically, the "Purpose of this publication " section in USITC Publication 1073 states that the Appendix was established to "facilitate the determination of the CAS registry numbers applicable to imported **chemicals and products** classifiable in the TSUS [the predecessor to the current HTSUS]. . . ", given the fact that "**any single chemical frequently moves in commerce under a number of different names, including trade names**." Id. at 1 (emphasis added). Hence, this demonstrates the Chemical Appendix refers to completed products, in addition to single chemicals, and it does so by CAS No., trade names, and other names.

USITC Publication 1074 also supports this interpretation of the Appendix's operation. USITC Publication 1074 lists chemical products in order of C.A.S. No. and further lists corresponding trade names under each registry number. Indeed, two of the subject color preparations are listed by trade name under a corresponding C.A.S. No.[5] See USITC Publication 1074 at 1 ("This Publication lists the C.A.S. registry numbers from the Chemical Appendix, numerically, and provides several corresponding chemical or trade names for each C.A.S. registry number listed."). The listing of trade names adjacent to corresponding C.A.S. No. is further evidence that the Chemical Appendix was intended to include products not solely based

_____

[5] These include Irgalite Red PRR, under C.A.S. No. 2814-77-9, and Irgalite Yellow BAW, under C.A.S. No. 5102-83-0. See USITC Publication 1074 at 00305, 00365.

20

on those registry numbers.

In addition, the legislative history of the Chemical Appendix emphasizes the protectionist thrust of the decision to preserve the ASP valuation method for certain classes of chemical imports. Senate Report No. 96-249, reprinted in 1979 U.S.C.C.A.N. 381, 512 provides:

> Reason for the Provision. - The U.S. acceptance of the Customs Valuation Agreement will require the repeal of the ASP customs valuation for benzenoid chemicals (coal-tar products), certain plastic or rubber-soled footwear, canned clams, and certain knit wool gloves and mittens. The converted rates were determined by the administration based on studies by the U.S. International Trade Commission. The U.S. acceptance of the agreement will also require the repeal of section 402a of the Tariff Act of 1930, the basis for valuing items on the so-called "Final List." This required an adjustment of the tariff rates on certain ball bearings and pneumatic tires.
>
> **The nomenclature and rates of duty contained in sections 222 and 223 for certain merchandise currently subject to valuation under section 402a are designed to insure that U.S. industries producing the merchandise in question will receive protection under that nomenclature and rates of duty that is substantially equivalent to the protection they receive from present rates of duty applied on appraised value determined under present U.S. law.**

Id. (emphasis added). The decision to preserve the ASP valuation method was clearly driven by a desire to protect domestic industry from import competition.

**2**

**Though they Do Not Constitute Legislative History, the ITC Publications Provide Probative and Persuasive Insight into the Scope and Operation of the Chemical Appendix.**

The Publications in conjunction with the current legislative history strongly support Customs' position. Moreover, the court notes that "the plain meaning rule . . . is not to be used to thwart or distort the intent of Congress by excluding from consideration enlightening material

from the legislative files." 2 Norman J. Singer, Sutherland Statutory Construction § 48.01 at 413 ( 6th ed. 2000) (quoting Federal Communications Commission v. Cohn, 154 F Supp. 899 (1957)). It is clear from the cited legislative history that the Chemical Appendix was designed to protect domestic industry from foreign competition. However, that legislative history does not detail the practical scope of the Appendix in operation.

Since the legislative history does not specifically define the term "by whatever name known", the court therefore turns to the Publications as a reliable source of information. Again, the court notes that "[w]hen a tariff term is not defined in the HTSUS or its legislative history, the term's correct meaning is its common meaning." Pillowtex Corp. v. United States, 171 F.3d 1370, 1374 (1999). To determine the common meaning of a tariff term, a court may consult dictionaries, lexicons, the testimony in the record, **and other reliable sources of information**. See JVC Co. of Am. v. United States, 62 F. Supp. 2d 1132, 1137 (1999), aff'd, 234 F.3d 1348 (Fed. Cir. 2000). Moreover, although the Publications may not inherently qualify as legislative history, since it is undisputed that the ITC was responsible for establishing the Chemical Appendix, they are nonetheless persuasive. Hence, in the vacuum left by the legislative history, the court finds that the Publications' description of the Appendix's operation and scope is a logical extension of the given legislative intent.

Ciba-Geigy attacks Customs' reliance on the Publications. It first argues that the current Chemical Appendix cannot be deemed equivalent to the listings contained in the Publications as there is a significant degree of incongruence. Specifically, Ciba-Geigy stresses the absence of some of the C.A.S. numbers listed within the Publications from the current Appendix. See Plaintiff's Response at 6-7. On this basis, it concludes that "[t]hese publications may have been

22

points of progression in the development of the Chemical Appendix. They are not the final product and most certainly (as agency publications) do not constitute legislative history, as defendant implies." Id. at 7.

Indeed, Customs does not dispute the fact that there are C.A.S. numbers within the publications that are not contained within the Appendix, but asserts that this fact is irrelevant to its analysis. Moreover, Customs concedes that "during the intervening years [between the publications and the current Appendix], the Chemical Appendix has been modified by the deletion of C.A.S. numbers and common chemical names and trade names." Defendant's Response to Plaintiff's Opposition to Defendant's Cross Motion for Summary Judgment ("Defendant's Response") at 6. However, as Customs clarifies, "the more important aspect of the ITC publications is that they demonstrate that the C.A.S. registry numbers listed in the Chemical Appendix represent not only the single chemical colorant, but all products by which that colorant is known." Id. It is conceivable and reasonable that the listings within USITC Publications 1073 and 1074 served as prototypes for the Chemical Appendix, which was subsequently refined, without overriding that fundamental premise. As such, the incongruence between the Appendix and the publications is irrelevant to the significance of the publications and fails to undermine Customs' premise.

Since the parties have presented no contrary evidence or legislative history, the ITC publications satisfactorily and adequately support the Government's position.

**3**

**Ciba-Geigy's Own Practices Appear to Coincide with the Government's Reading of the Chemical Appendix.**

Ciba-Geigy's commercial practices also support this reading. Ciba-Geigy, in fact, identifies its own products by the color index names of the primary coloring matter and does not constrain itself to the C.A.S. Registry Numbers. See Defendant's Response at 4, Defendant's Exhibit F. This has significant consequences with regard to the Chemical Appendix. For instance, "even though Irgalite Rubine 4 BP contains two colorants . . . , it is identified [by Ciba-Geigy] by the Color Index Name of the principal colorant, Pigment 57:1 [sic]," id. (citing Schedule 1 to Plaintiff's Motion), and "[w]hile the color index name[] Pigment 57:1 . . . [is] not listed in the Chemical Appendix, the corresponding C.A.S. registry number[] for [this] colorant[] [is]." Id. Ciba-Geigy further supports this approach, by having failed to contest Customs' classification of color preparations that were provided for on an eo nomine basis in the HTSUS tariff headings by Color Index Name. Id. As such, Pigment Yellow 109 was classified in this fashion under subheading 3204.17.10, which "provides for many Pigment Yellows, including Pigment Yellow 109." Id. at 4 (citing HTSUS (1991) at 32-10).

Moreover, many of Ciba-Geigy's products were subject to pre-classification rulings, where its own input was solicited by Customs in ultimately choosing the higher duty tariff provisions. "Customs agreed with most of Ciba-Geigy's proposed classifications, including classification of much of the merchandise in issue in the assessed provisions of subheadings 3204.12.50, 3204.17.50 and 3204.19.19." Defendant's Response at 14 (citing Defendant's Exhibit M, copy of PC 866947 (Pre-classification Ruling) (September 20, 1991)). Indeed, "Ciba-

24

Geigy itself proposed classification in the provisions covering merchandise which is listed in the Chemical Appendix." Id.


**4**

**Customs' Reading of the Chemical Appendix is Supported by the Language of the Appendix, the Legislative History, and the ITC Publications.**


The Government's interpretation of the Chemical Appendix flows from the plain language of the statute and affords all language therein meaning. The Appendix expressly provides that it may refer to a chemical compound or preparation "by whatever name known." This broad range is further clarified by the ITC publications in light of the given legislative intent. Therefore, 1) the Chemical Appendix can refer to a color preparation by virtue of its main color ingredient via C.A.S. Registry Number, by trade name (Microlith, Unisperse, etc.), by Color Index Name and number, or by chemical name; 2) the Chemical Appendix was designed to encompass discreet compounds as well as the color preparations based upon such compounds; and 3) as a result of the first two points, the Chemical Appendix may refer to individual compounds and the preparations based thereon redundantly.


**B**

**The Presence of Non-Color Ingredients Does Not Impact the Classification of the Subject Color Preparations.**


The parties are clearly divided as to the significance of non-color ingredients in classifying the subject color preparations. As discussed, Ciba-Geigy asserts that non-color ingredients bear significantly on the classification of the color preparations and asserts the de

25

minimus rule both *qualitatively* and *quantitatively*. Ciba-Geigy further asserts that "[d]efendant cites no statutory language which indicates that preparations containing coloring matter (dyes or pigments) are to be classified by disregarding the fact they are preparations and not merely the dye or pigment component." Plaintiff's Reply at 11. Ciba Geigy relies on the court's decisions in Alcan Aluminum, Inc. v. United States, 165 F.3d 898 (Fed. Cir. 1999), and BestFoods v. United States, 110 F. Supp. 2d 965 (CIT 2000), rev'd, 260 F.3d 1320 (Fed Cir. 2001), in support of applying the de minimus rule, the latter providing:

> There can be no doubt that absent explicit expression of legislative intent to the contrary, as a matter of fundamental fairness and reasonable statutory interpretation, there is an implied recognition of the *de minimus* principle under the governing statute; indeed, absent explicit legislative intent to the contrary, a very heavy burden falls on a party which insists that the purpose of the underlying statute compels abandonment of the *de minimus* rule.

Plaintiff's Motion at 13 (quoting BestFoods, 100 F. Supp. at 972).


# 1
## The De Minimus Rule Does Not Apply to Classification of the Color Preparations at the Six-Digit HTSUS Level.


Customs, however, avers that the presence of non-color ingredients cannot and does not affect classification of the color preparations at the 6-digit HTSUS level, as "it is the presence and nature of the coloring matter in each of the products that mandates classification in Heading 3204." Defendant's Response at 10. Customs points out the fact that Ciba-Geigy does not dispute the fact the color preparations should be classified within heading 3204 and, more specifically, under 3204.12, 3204.17, 3204.19 at the 6-digit level. Id. Customs correctly argues that the de minimus rule does not bear on this level of classification, for "[i]f it did, [Ciba-Geigy]

26

could not at the same time agree that 3204.12, 3204.17 and 3204.19 are the correct classifications at the six digit level." Id. Furthermore, Plaintiff appears to concede this fact, stating "the presence of non-color ingredients can require classification of a preparation, even a preparation whose principal purpose is to impart color, outside heading 3204." Plaintiff's Response at 13 (citing BASF Wyandotte Corp. v. United States, 11 CIT 652, 674 F. Supp. 1477, aff'd, 855 F.2d 852 (Fed. Cir. 1988)). Therefore the court dispenses with any related inquiry at the 6-digit HTSUS level.

Nonetheless, Ciba-Geigy stresses that non-color ingredients can affect classification even within HTSUS heading 3204 (at the 8-digit level) by determining whether or not the color preparation is listed within the Chemical Appendix. Ciba-Geigy clarifies that its "position [is] that the presence of non-color ingredients must be considered in determining whether the subject preparations are listed in the Chemical Appendix." Plaintiff's Response at 13. Furthermore, Ciba-Geigy asserts that "[e]ach of the subject preparations incorporates non-color ingredients which are not *de minimus*." Plaintiff's Motion at 14. Hence, as each preparation is a collection of chemical compounds, many of which perform functions integral to the overall performance of the preparation, under Ciba-Geigy's logic, none would be within the Chemical Appendix.

Ciba-Geigy stresses the functional qualitative and quantitative significance of these non-color ingredients which "aid flow, antifreeze, binders, biocides, defoamers, dispersing agents, extenders, solvents, stabilizers, and surface treatments," and are "integral elements of the makeup of the subject preparations." Id. at 15. For instance, Ciba-Geigy cites Corporacion Sublistatica, S.A. v. United States, 1 CIT 120, 511 F. Supp. 805 (1981), and BASF, 11 CIT 652, as instances where the court recognized the significance of binders and solvents in an incorporating substance

27

such as ink. In addition, citing the decision in <u>General Motors Corp. v. United States</u>, 15 CIT 372, 770 F. Supp. 641 (1991), <u>rev'd on other grounds</u>, 976 F.2d 716 (Fed. Cir. 1992), as an example regarding paint, Ciba-Geigy concludes that "ingredients such as stabilizers, extenders, additives to aid flow, all of which affect surface quality, as well as solvents and binders, which are essential in paint as ink applications, are not *de minimus* from the perspective of function." <u>Id.</u> at 17. Secondly, Ciba-Geigy emphasizes the fact that the non-color compounds are present in significant quantities as well, stating that "in the case of 24 of the 56 preparations at issue, they are present in quantities greater than the coloring matter." <u>Id.</u>

**2**

**The <u>De</u> <u>Minimus</u> Rule Should Not be Applied to Vitiate the Statute's Underlying Purpose.**

The presence of the non-color ingredients may be both qualitatively and quantitatively significant, however their presence alone cannot place the preparations under the tariff subheadings espoused by Plaintiff. Moreover, the Plaintiff's reliance on <u>Alcan</u> and <u>BestFoods</u> in support of applying the <u>de</u> <u>minimus</u> rule appears misplaced in light of the current legislative intent as well as the established history and purpose of the Chemical Appendix.

Although the court in <u>Alcan</u> forbade Customs from abandoning the <u>de</u> <u>minimus</u> rule, it cautioned that

> Whether a particular activity is a de minimus deviation from a prescribed standard must, of course, be determined with reference to the purpose of the standard . . . . Application of de minimus is particularly important in cases such as the one at hand, where stark, all-or-nothing operation of the statutory language would have results contrary to its underlying purposes.
>
> . . . .

> In contrast, Customs' proposed abandonment of the de minimus principle in this case engenders results at odds with the statutory purpose.

Alcan Aluminum, 165 F.3d at 903 (quoting Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co., 505 U.S. 214, 232, 112 S. Ct. 2447, 120 L. Ed. 2d 174 (1992)).

Hence although the de minimus rule is a major tenet of statutory interpretation, it is not an absolute principle and its application must be considered in light of the given statute. In Alcan, the court's overriding goal was to preserve the underlying purpose of the statute. Therefore it invoked the de minimus rule to prevent a contrary outcome resulting from hyper-literal application of the statutory language.

Similarly, in order to preserve the underlying statutory purpose, the Federal Circuit reversed the lower court's holding in Bestfoods, concluding that a Customs regulation permissibly *barred* any de minimus exception for a certain class of products, despite the fact the same regulation expressly provided such exception for other products. See Bestfoods v. United States, 260 F. 3d 1320 (Fed. Cir. 2001). In BestFoods, the primary issue before the court concerned the operation of Customs regulation 19 C.F.R § 102.13 (2000), promulgated under the federal marking statute, 19 U.S.C. § 1304(a) (1994). The marking statute expressly delegates to the Secretary of the Treasury the authority to promulgate regulations implementing the marking statute, in general, and as it specifically applies to goods imported from a North American Free Trade Agreement ("NAFTA") country. See 19 U.S.C. §§ 1304(a) (1999) and 1304(k) (Supp. 2001); 19 U.S.C. § 3314(b) (1994). The plaintiff in BestFoods claimed that section b of the regulation, 19 C.F.R § 102.13(b) (2000), which did not provide the 7% de minimus exception for agricultural products that was provided for other products, was arbitrary

29

and capricious. <u>BestFoods</u>, 260 F. 3d at 1323. In other words, under 19 C.F.R § 102.13(b), *all* agricultural goods containing foreign-source components would have to be marked accordingly. As discussed, Ciba-Geigy relies on the lower court's holding which invalidated the regulation for failure to provide the <u>de minimus</u> exception for goods falling under section (b).

Ultimately however, the Federal Circuit upheld the regulation, reasoning that it was consistent with the treatment of agricultural products under both NAFTA and the federal marking statute. <u>Id.</u> at 1326. The Federal Circuit recognized Customs' decision to withhold a <u>de minimus</u> exception in one instance and expressly grant one in another as a codification of its past practice. In addition, the Federal Circuit recognized this decision as a valid attempt to harmonize Customs' implementation of the federal marking statute with the country of origin rules for preferential tariff treatment under NAFTA. Taking note of the fact the federal marking statute itself did not provide for any <u>de minimus</u> exception, the Federal Circuit stated:

> [T]he limited de minimus exception in the regulations corresponds with Customs' past practice . . . .
>
> . . . .
>
> In addition, withholding the de minimus exception from agricultural products tends to harmonize the country of origin rules for marking purposes with the country of origin rules for preferential tariff treatment under the NAFTA. The country of origin rules for preferential tariff treatment, while providing a de minimus exception for components comprising less than 7% of the value of the overall good, withhold this treatment from agricultural products. Customs' action in establishing a de minimus rule, for purposes of the NAFTA marking rules, that closely tracks the de minimus rule for preferential tariff treatment under the NAFTA is not arbitrary.

<u>Id.</u> at 1324-25 (footnotes omitted).

Therefore the <u>de minimus</u> rule cannot be mechanically applied where doing so would

30

*interfere* with the purpose of the underlying statute. This is especially true given that "the master rule in the construction of tariff acts, as of other statutes, is to interpret them so as to carry out the legislative intent." United States v. Clay Adams Co., 20 CCPA 285, 288 (1932); see also Sturm, Customs Law and Administration, § 51.3 at 15 (citations omitted). Hence the Federal Circuit's decision in BestFoods further underscores the fact that the de minimus rule is not an absolute principle, but rather that it must yield and conform to the purpose of the underlying statute. Morever, the decision supports Customs' selective employment of a de minimus exception in order to best effectuate a statutory scheme. The BestFoods situation is paralleled here. The Chemical Appendix was intended to protect certain industries by preserving the tariff scheme in place prior to the Act. Towards that end, the language of the Chemical Appendix was structured to be inclusive and to refer to base chemicals and products by C.A.S. Registry Number or by "whatever name known." Given these facts, the de minimus rule cannot be applied as Ciba-Geigy demands. As Defendant states, "[t]o accept Ciba-Geigy's de minimus argument would vitiate the Chemical Appendix, because, as is evident from the merchandise in issue, coloring matter is frequently combined with other non-color ingredients such as additives to aid flow, antifreeze, binders, brocides, defoamers, dispersing agents, extenders, solvents, stabilizers and surface treatments involved here . . . . That result surely was not intended by Congress and should not be accepted by this Court." Defendant's Motion at 20 (citing Exhibits A & D). Since the Plaintiff's approach would ensure that "virtually no coloring matter would be subject to the applicable higher rate", id., the court cannot adopt that approach in contravention of the legislative intent. Moreover, the court concludes that Customs' decision to withhold the de minimus exception under these circumstances is a legitimate means of effectuating the statutory

intent.

## C

## The Only Inquiry Required to Classify the Subject Color Preparations is Whether the Main Ingredient of the Preparation is Listed Within the Chemical Appendix by Whatever Name Known.

Given the above analysis, the court's inquiry is greatly simplified. In keeping with the Chemical Appendix's established function (to determine whether the color preparation was imported into or produced within the United States prior to the critical dates), Customs asserts that the determination of a color preparation's importation date is governed by the Chemical Appendix Note "(1) by reference to their registry number with the Chemical Abstract Service (C.A.S.) of the American Chemical Society where available, or (2) by reference to the common chemical name or trade name where the C.A.S. registry number is not available. For purposes of these schedules, **any reference to a product provided for in this appendix includes such products listed herein, by whatever trade name known.**'" Defendant's Motion at 14 (quoting Chemical Appendix Note, HTSUS.) (emphasis in original motion). As such, "[t]he coloring matter in all but four of the imported products was unquestionably imported or produced in the United States in the relevant time periods because not only their C.A.S. Number, but also in many cases their Color Index Name and/or Number is listed." Defendant's Motion at 19. Therefore these 52 color preparations are correctly dutiable under the higher duty tariff provisions.

# VI
## CONCLUSION

For the foregoing reasons, Defendant's Cross-Motion For Summary Judgment is granted in full, and Plaintiff's Motion For Summary Judgment is denied.

_____
Evan J. Wallach, Judge

Dated: November 16, 2001
      New York, New York