Slip Op. 05-68

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |
|---|---|
| BASF Corp., | : |
|  | : |
| Plaintiff, | : |
|  | : Before: WALLACH, Judge |
| v. | : Court No.: 01-00118 |
|  | : |
|  | : **PUBLIC VERSION** |
| THE UNITED STATES, | : |
|  | : |
| Defendant. | : |
|  | : |
|  | : |

_____:

[Judgment for Plaintiff.]

Dated: June 13, 2005

Barnes, Richardson & Colburn, (James S. O'Kelly, Frederic D. Van Arnam, Jr., and Helena D. Sullivan) for Plaintiff BASF Corporation.

Peter D. Keisler, Assistant Attorney General; Barbara S. Williams, Attorney-in-Charge, International Trade Field Office; Jack S. Rockafellow, Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; and Sheryl A. French, Office of Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, U.S. Department of Homeland Security, for Defendant United States.

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

**Wallach, Judge:**

**I**
**INTRODUCTION**

This matter is before the court for decision following a bench trial on November 30,

2004, December 1, 2004, and December 2, 2004. In this action, Plaintiff BASF Corporation

1

("BASF" or "Plaintiff") challenges United States Customs and Border Protection's[1] ("Customs") classification of its imported merchandise, Lucarotin® 1% CWD S/K ("Lucarotin® 1%"), a food colorant, under Harmonized Tariff Schedule of the United States ("HTSUS") (1999) subheading 2106.90.99 at 7% *ad valorem* as "food preparations not elsewhere specified or included: Other: Other: Other: Other: Other: Other." Plaintiff claims that its product is properly classifiable under subheading 3204.19.35 of the HTSUS, as "beta carotene and other carotenoid coloring matter," which is duty free pursuant to the Pharmaceutical Appendix, or alternatively duty-free under subheading 2936.90.00 of the HTSUS, as a mixture of provitamins and vitamins. Shortly before the trial, Defendant abandoned its alternative claim that Lucarotin® 1% is classifiable under subheading 2106 and now argues that the product is properly classifiable under HTSUS 3204.19.40 "Other: Products described in additional U.S. note 3 to section VI" or HTSUS 3204.19.50 "Other: Other." This Court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (2004). For the following reasons, the court finds that Lucarotin® 1% is properly classified under HTSUS 3204.19.35 as "beta-carotene and other carotenoid coloring matter."

**II**
**BACKGROUND**

On or about November 19, 1999, Plaintiff entered the subject merchandise under Entry No. 110-0697173-2 under HTSUS subheading 3204.19.35[2] from Germany through the Port of

---

[1] Effective March 1, 2003, the United States Customs Service was renamed the United States Bureau of Customs and Border Protection. See Homeland Security Act of 2002, Pub. L. 107-296, § 1502, 116 Stat. 2135, 2308-09 (2002); Reorganization Plan for the Department of Homeland Security, H.R. Doc. No. 108-32 (2003).

[2] HTSUS Subheading 3204.19.35 through 3204.19.50 provide for:

3204.00 Synthetic organic coloring matter, whether or not chemically defined; preparations as specified in note 3 to this chapter based on synthetic organic coloring matter; synthetic organic products of a kind used as fluorescent brightening agents or as luminophores, whether or not chemically defined:

Synthetic organic coloring matter and preparations based thereon as specified in note 3 to this chapter:

\*      \*      \*

3204.19 Other, including mixtures of coloring matter of two or more of the subheadings 3204.11 to 3204.19:

\*      \*      \*

Other:

\*      \*      \*

3204.19.35 Beta-carotene and other carotenoid coloring matter.....kg......3.1% Free (A\*,CA,E,IL, 25% J,K,MX)

Other:

3204.19.40 Products described in additional U.S. note 3 to section VI.............kg...... 10.8% Free (A+,CA,E,IL, 50.5% J) 6% (MX)

3204.19.50 Other.....................kg......13.2% Free (A+,CA,E,IL, 50.5% J) 8% (MX)

Note 3 to this chapter states that

Headings 3203, 3204, 3205 and 3206 apply also to preparations based on coloring matter (including, in the case of heading 3206, coloring pigments of heading 2530 or chapter 28, metal flakes and metal powders), of a kind used for coloring any material or used as ingredients in the manufacture of coloring preparations. The headings do not apply, however, to pigments dispersed in nonaqueous media, in liquid or paste form, of a kind used in the manufacture of paints, including enamels (heading 3212), or to other preparations of heading 3207, 3208, 3209, 3210, 3212, 3213 or 3215.

Newark, New Jersey.  The subject merchandise is a red-orange powder sold as a food colorant and is used to impart color to a variety of foods and beverages.  As the name of the product indicates, the subject merchandise contains 1% beta-carotene and 99% other materials.

Customs liquidated the entry and classified the Lucarotin® 1% under HTSUS Subheading 2106.90.99[3] assessing a 7% *ad valorem* duty thereon, and liquidating accordingly.

---

Additional U.S. note 3 to section VI states

> The term "products described in additional U.S. note 3 to section VI" refers to any product not listed in the Chemical Appendix to the Tariff Schedule and--
>
> > (a)    For which the importer furnishes the Chemical Abstracts Service (C.A.S.) registry number and certifies that such registry number is not listed in the Chemical Appendix to the Tariff Schedule; or
> >
> > (b)    Which the importer certifies not to have a C.A.S. registry number and not to be listed in the Chemical Appendix to the Tariff Schedule, either under the name used to make Customs entry or under any other name by which it may be known.

[3]  HTSUS Subheading 2106.90.99 provides for:

2106.00        Food preparations not elsewhere specified or included:

$$* \qquad * \qquad *$$

2106.90           Other:

$$* \qquad * \qquad *$$
Other:

$$* \qquad * \qquad *$$
Other:

$$* \qquad * \qquad *$$
Other:

$$* \qquad * \qquad *$$

4

Plaintiff paid all liquidated duties, taxes, and fees and filed a timely protest on July 25, 2000, with the Port Director at Newark, New Jersey, challenging Customs' classification. Plaintiff claimed that Lucarotin® 1% should have been classified under HTSUS subheading 3204.19.35 with a 3.1% *ad valorem* duty. Customs denied Plaintiff's protest on October 6, 2000. On April 3, 2001, Plaintiff commenced this action by filing a Summons with this court.

## III
## STANDARD OF REVIEW

Pursuant to the court's jurisdiction under 28 U.S.C. § 1581(a) (2001), the statute provides for judicial review of denied protests filed in accordance with 19 U.S.C. § 1514 (2001). Although Customs's decisions are entitled to a presumption of correctness under 28 U.S.C. § 2639(a)(1) (2001), the Court makes its determinations upon the basis of the record made before the Court, rather than that developed by Customs. See United States v. Mead Corp., 533 U.S. 218, 233 n.16, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001). Accordingly, the Court makes the following findings of fact and conclusions of law as a result of the *de novo* trial. See 28 U.S.C. § 2640(a) (2001).

---

|  | Other: |
| --- | --- |
|  | * * * |
| 2106.90.99 | Other:..........7% Free (A,CA,E,IL,J, 20% MX) |

5

# IV
# FINDINGS OF FACT

## A
## Facts Uncontested By The Parties And Agreed To In The Pretrial Order

1. The imported merchandise is sold under the name Lucarotin® 1% CWD S/K.

2. "Lucarotin® 1%" is a registered trademark of BASF Corporation.

3. Lucarotin® 1% CWD S/K a free-flowing, red-orange powder that is cold water dispersible, consisting of a dispersion of beta-carotene stabilized in soybean oil, which is embedded in the form of very fine beadlets in a matrix of dextrin and d-glucose. It is stabilized with dl-alpha tocopherol and ascorbyl palmitate, and contains tricalcium phosphate as a flow-aid.

4. Lucarotin® 1% CWD S/K is a mixture of the following chemicals with the respective Chemical Abstract Service ("CAS") registry number in the stated amounts:

| Chemical Name | CAS | Amount |
| --- | --- | --- |
| Beta-carotene | 7235-40-7 | ~ 1.0% |
| D-Glucose | 50-99-7 | ~ 64.0% |
| Maltodextrin | 50-36-6 | ~ 24.0% |
| Soybean Oil | 8001-22-7 | ~ 5.0% |
| Ascorbyl Palmitate | 137-66-6 | ~ 1.0% |
| dl-alpha-tocopherol | 191-41-0 | ~ 0.5% |
| Tricalcium Phosphate | 7758-87-4 | ~ 1.0% |
| Water | 7732-18-5 | ~ 3.5% |

5. Beta-carotene is a carotenoid.

6. Beta-carotene is organic coloring matter that imparts a yellow, orange or reddish color.

7. Beta-carotene is provitamin A.

6

8.   Beta-carotene is an antioxidant.

9.   The Beta-carotene in Lucarotin® 1% CWD S/K is synthetically derived.

10.   Beta-carotene is fat soluble.

11.   Beta-carotene is not water soluble.

12.   The d-glucose is used as a filler, to harden the beadlet, and as a dispersant making the beta-carotene water soluble.

13.   The maltodextrin is used as a filler, to harden the beadlet, and as a dispersant making the beta-carotene water soluble.

14.   The beta-carotene is dissolved in the soybean oil, which functions as a carrier for the beta-carotene.

15.   The ascorbyl palmitate is a fat soluble antioxidant used to stabilize the beta-carotene.

16.   Ascorbyl palmitate is a derivative of vitamin C.

17.   The dl-alpha-tocopherol is an antioxidant used to stabilize the beta-carotene.

18.   Dl-alpha-tocopherol is vitamin E.

19.   The water is a non-functioning component that is residual content from the manufacturing process and that is not deliberately left in the product.

20.   The tricalcium phosphate is an anticaking agent.

21.   The d-glucose and maltodextrin are carbohydrates.

22.   Lucarotin® 1% CWD S/K is sold for use as a food colorant.

23.   Lucarotin® 1% CWD S/K is used to impart color to a wide variety of foods, including fruit drinks and other beverages, yellow cakes, bagels, and breads.

**B**
**Facts Established At Trial**

24. Dr. Herbert Woolf, witness for Defendant, is the North American Market Development Manager in the Human Nutrition Group at BASF Corporation. He is a scientist responsible for technical sales and technical marketing. The Court found the testimony of Dr. Woolf highly probative and credible.

25. Lucarotin® 1% is BASF's highest-selling beta-carotene product used for coloration of a variety of food stuffs. Customers do not buy Lucarotin® 1% for any purpose other than delivery of a beta-carotene colorant.

26. The word "Lucarotin® 1%" is a trademarked name comprising of the words: "carotin," the German word for beta-carotene, and the "Lu," for "Ludwigshafen," the German town in which the product was produced.

27. Lucarotin® 1% contains beta-carotene, which is "nature identical,"an industry term meaning that the composite chemicals are synthesized to mimic or represent naturally derived materials. Chemically, synthetic beta-carotene is identical to natural crystalline beta-carotene.

28. Pure crystalline beta-carotene cannot be added directly to a beverage as a colorant.

29. Beta-carotene is a known food colorant and its primary use is as a colorant. In larger doses, beta-carotene can be a dietary supplement as an antioxidant.

30. Because beta-carotene is fat soluble by nature, not water soluble, Lucarotin® 1% is cold water dispersible, that is, the beta-carotene must be formulated as such to be dispersible in water.

31. BASF produces 99.9 pure, crystalline beta-carotene, but it does not sell it in this form. BASF and other companies who manufacture synthetic beta-carotene, however, do provide samples of the material to researchers for analytical purposes.

32. BASF does not buy pure beta-carotene from any other company.

33. BASF does not produce crystalline beta-carotene for direct sale for use as a colorant because the crystals are unstable and pyrogenic.

34. Pure, crystalline beta-carotene, because of its pyrogenic qualities, must be transported under specific conditions: in an airtight container in which the container is flushed with an inert gas such as helium or nitrogen.

35. In the production of Lucarotin® 1%, BASF takes the synthetic beta-carotene crystals and disperses them in vegetable oil with heat, making it into a solution. The production process requires the mixing of this solution with another solution containing sugars and dextrin. Vitamin emulsifiers in the ester form and ascorbyl palmitate are added. When all of these are combined, Lucarotin® 1% is produced.

36. The processing of the beta-carotene into Lucarotin® 1% is to provide standardization, so that the colored products are consistent from one batch to the next. The design of Lucarotin® 1% accomplishes two things: crystalline beta-carotene is unstable as it oxidizes and self-combusts. The stabilizers, antioxidants (Vitamin E, also known as dl-alpha-tocopherol, and a derivative of Vitamin C, known as ascorbyl palmitate), protect the beta-carotene from being oxidized. The design also provides a product to the food industry in a form in which it can be used as a colorant.

37. BASF Corporation has a Technical Bulletin which describes the physical characteristics of Lucarotin® 1% so that a user can identify it based on the description contained therein. The document is provided with every sample and is available on the BASF's website. The document describes Lucarotin® 1% as a "stabilized beta-carotene [that] is dispersed in soybean oil and embedded as minute droplets in a polysaccharide sugar matrix . . . ."

38. BASF also provides a Material Data Safety Sheet to customers or potential customers which gives safety guidance for use in handling the material if there is incidental exposure to a concentrated form. The document gives the common chemical ingredient in Lucarotin® 1% as beta-carotene.

39. The beta-carotene in Lucarotin® 1% does not go through chemical alterations in the manufacturing process. The beta-carotene in Lucarotin® 1% that goes into the manufacturing process is the same as the beta-carotene in Lucarotin® 1% at the end of the manufacturing process.

40. Beta-carotene is the only active ingredient in Lucarotin® 1% – the other 99% percent of the ingredients are stabilizers or delivery agents.

41. The beta-carotene in Lucarotin® 1% is the only ingredient that imparts color.

42. The beta-carotene in Lucarotin® 1% is by far the most expensive ingredient.

43. Dr. Paul Lachance, witness for Plaintiff, is a Professor Emeritus of Food Science at Rutgers, The State University of New Jersey. The court found Dr. Lachance qualified to testify as an expert witness in the areas of carotenoids, beta-carotene, and carotenoid coloring matter.

44. The court found the testimony of Dr. Lachance generally unpersuasive. The court found Dr. Lachance's diction and volume difficult to understand and indicated this during Trial. Because of the prevalent discrepancies the court has found between the trial transcript and the recorded trial proceedings throughout the Trial, the court will give only limited weight to the transcript of Dr. Lachance's testimony.

45. Beta-carotene, canthaxanthin, and beta-apo-8-carotenal are all carotenoids used as colorants.

46. Beta-carotene imparts the essential character to Lucarotin® 1%.

47. The Government acknowledged that the active ingredient in Lucarotin® 1% is beta-carotene.

48. Mr. Barry Kaufman, witness for Plaintiff, is a Senior Product Manager at BASF corporation who is responsible for the marketing of many products, including Lucarotin® 1% and the whole Lucarotin® 1% product line. The court found that Mr. Kaufman, within his area of knowledge, demonstrated factual knowledge and the ability to perceive and recollect.

49. Lucarotin® 1% is marketed as one-percent beta-carotene for coloration.

50. Customers of Lucarotin® 1%, including the bakery, beverage, soup, and candy industries, use the product to impart an orange-yellow color to their products.

51. Eighty to ninety percent of the Lucarotin® 1% that is produced is used in the beverage industry.

52. Customers buy beta-carotene based colorants like Lucarotin® 1% (as opposed to cheaper synthetic colorants) so that they can advertise as such.

53. A brochure BASF provides to its customers reads: "BASF's line of Lucarotin® 1% Beta-carotene products provide a broad range of colors and application to the food industry."

54. In the United States, the companies DSM (formerly known as Hoffman Laroche) and Allied sell similar and competitive products to Lucarotin® 1% and market their colorants in the same way.

55. There is no market for crystalline beta-carotene in the United States.

56. Mr. Harvey Kuperstein, witness for Defendant, is a National Import Specialist for

the United States Bureau of Customs and Border Protection. The court found the testimony of Mr. Kuperstein to be unpersuasive. He contradicted himself and was not entirely accurate in terms of his knowledge and ability to recollect.

57. Mr. Kuperstein conceded that subheading 3204.19.35 is not limited to crystalline or U.S. Pharmacopeia grade beta-carotene and other carotenoids.

58. The Government approved a protest on Customs' Entry No. WBA 9034927-4, a similar product to Canthaxanthin 10 percent CWS/N made by Roche Vitamins and classified the entry under HTSUS subheading 3204.19.35 on August 13, 2004.

59. Dr. Robert Olson, witness for Defendant, received his A.B. from Gustavus Adolphus College, Ph.D. in Biochemistry from St. Louis University, and his M.D. from Harvard Medical School. Dr. Olson testified as an expert in the fields of biochemistry and nutrition. The court found the testimony of Dr. Olson highly probative and credible.

60. Dr. Olson stated that the active ingredient in Lucarotin® 1% is beta-carotene.

61. Dr. Olson testified that the essential use of Lucarotin® 1% is to dye products.

62. Dr. Olson stated that the beta-carotene in Lucarotin® 1% gives the product its essential character as opposed to the other materials in the product.

63. If any of these Findings of Fact shall more properly be Conclusions of Law, they shall be deemed to be so.

## V
## CONCLUSIONS OF LAW

1. Lucarotin® 1% is properly classified under heading 3204.

2. Lucarotin® 1% is a mixture pursuant to the General Rules of Interpretation because it is a composite good consisting of different materials.

3. GRI 2(b)[4] directly applies to the classification of mixtures and refers to GRI 3 for

_____

[4] GRI 2(b) states that

> [a]ny reference in a heading to a material or substance shall be taken to include a reference to mixtures and combinations of that material or substance with other materials or substances. Any reference to goods of a given material or substance

11

guidelines for classification. Because GRI 3(b)[5] applies to mixtures and provides that for goods not classifiable under GRI 3(a) – in which the most specific description is preferred to the more general description in headings – the mixture shall be classified according to the material or component which gives it its "essential character."

4. The beta-carotene in Lucarotin® 1% gives the product its essential character because it is the only active ingredient.

5. The other ingredients in Lucarotin® 1% are inert ingredients that enrobe the beta-carotene to enhance stability, to make it soluble in water (since beta-carotene is only oil soluble), and to standardize the product for commercial purposes.

6. HTSUS Heading 3204 includes "[s]ynthetic coloring matter, whether or not chemically defined; preparations as specified in note 3 to this chapter based on synthetic organic coloring matter . . . [s]ynthetic organic coloring matter and preparations based thereon as specified in note 3 to this chapter."

7. The relevant section of Note 3 to Chapter 32 states that "Headings . . . 3204 [list

---

shall be taken to include a reference to goods consisting wholly or partly of such material or substance. The classification of goods consisting of more than one material or substance shall be according to the principles of rule 3.

[5] Pursuant to GRI 3(a) & (b)

When, by application of rule 2(b) or for any other reason goods are, *prima facie*, classifiable under two or more headings, classification shall be effected as follows:

(a) The heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put of retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.

(b) Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or the component which gives them their essential character, insofar as this criterion is applicable.

of headings], apply also to preparations based on coloring matter . . . , of a kind used for coloring any material or used as ingredients in the manufacture of coloring preparations."

8. Subheading 3204.19.35 covers "[b]eta carotene and other carotenoid coloring matter."

9. The structure of Heading 3204 down to Subheading 3204.19.35 is very similar in structure to Heading 3203 which was at issue in <u>Lynteq, Inc. v. United States</u>, 976 F.2d 693, 697 (Fed. Cir. 1992).

10. In <u>Lynteq</u>, which dealt with the classification of a colorant Cromophyl-L, Heading 3203 included vegetable or animal coloring matter and used the same language about preparations as in Heading 3204. The subheading 3203.00.10 listed a number of specific items: "annato, archil, cochineal, cudbear, litmus, logwood and marigold meal." <u>Lynteq</u>, 976 F.2d at 697. The Federal Circuit found that Cromophyl-L could not be classified under this subheading because "[t]he language of subheading 3203.00.10 [was] clear and unambiguous. That the *eo nomine* subheading, by its very clear terms, covers only coloring matter which comes within the common meaning of the items specifically enumerated therein: annato, archil, cochineal, cudbear, litmus, logwood and marigold meal." <u>Id.</u> at 696. Thus, "[a]n *eo nomine* provision which does not specifically provide for preparations does not encompass preparations within its ambit." <u>Id.</u> at 697.

11. Defendant argues that Lucarotin® 1% is a "preparation" and thus, pursuant to <u>Lynteq</u>, it should not be classified under HTSUS 3204.19.35. Plaintiff claims that Lucarotin® 1% is not a "preparation," and rather is only a "mixture." Alternatively, Plaintiff states that even if the court were to find that Lucarotin® 1% is a "preparation," the product should nevertheless be classified under HTSUS 3204.19.35. Since the parties do not disagree that Lucarotin® 1% is a mixture , their disagreement hinges on the definition of "preparation" and, in turn, the difference between the terms "preparation" and "mixture."

12. According to the General Rules of Interpretation, a "mixture" is a "composite [good] consisting of different materials or made up of different components."

13. The term "preparation" is not defined in the HTSUS or the General Rules of Interpretation.

14. In <u>United States v. Hanrahan</u>, 45 C.C.P.A. 120, 122 (1958), a "preparation" is defined as: "where the imported merchandise is a distinct and recognized article of commerce, having an individual name, and which is produced from a raw material by a definite series of steps, such merchandise is a preparation."

15. The Federal Circuit in Orlando Food Corp. v. United States, 140 F.3d 1437, 1441 (Fed. Cir. 1998) stated

> Inherent in the term "preparation" is the notion that the object involved is destined for a specific use. The relevant definition from The Oxford English Dictionary defines "preparation" as "a substance specially prepared, or made up for its appropriate use or application, e.g. as food or medicine, or in the arts or sciences." 12 The Oxford English Dictionary 374 (2d. ed. 1989).

16. These definitions of "preparation" in both Hanrahan and Orlando Foods are broad and unclear – the ambiguity of which make their application difficult and of little utility for the essential role of law – the prediction of results.

17. Even at Trial in the present case, there was a lack of consensus among the witnesses regarding exactly what the term "preparation" means.

18. Dr. Woolf suggested that because the beta-carotene in Lucarotin® 1% undergoes no "chemical reactions" in its manufacturing process, that the product is a "mixture." Trial Transcript ("Tr.") at 34. He, however, went on to explanation that the term "preparation" is not a term of art used in the food colorant industry. Tr. at 41-42.

19. Dr. Lachance suggested that some type of a chemical reaction was required among the ingredients of the product for it to be a "preparation." Tr. at 127.

20. Mr. Kuperstein claimed that "preparation" could be defined as "a purposeful mixture... for a specific use," but upon questioning was hard pressed to differentiate between a "preparation" and a "purposeful mixture." Tr. at 283.

21. Dr. Olson stated that "preparation" can have "multiple definitions." Tr. at 446.

22. From these varying definitions, both in the case law and during trial, Lucarotin® 1% could be a "preparation," but depending on the product or merchandise at issue and context, any such item could be a "mixture" or "preparation."

23. The court, however, needs neither to determine the meaning of the tariff term "preparation," nor whether Lucarotin® 1% is a "preparation," see Orlando Foods, 976 F.2d at 697, because Lucarotin® 1% falls squarely within the scope of subheading 3204.19.35.

24. In the present case, subheading 3204.19.35 is less restrictive than the subheading in Lynteq, which just lists the particular raw material colorants, and suggests a

14

more inclusive scope.

25.     The subheading 3204.19.35 enumerates "beta carotene and other carotenoid coloring matter": using the canon of statutory construction *noscitur a sociis*[6] both "beta carotene" and "other carotenoid" modify the term "coloring matter." This is because "beta carotene" is a type of carotenoid along with, e.g. canthaxanthin, 8'-apo-beta-carotenol, which would be classified as the "other carotenoid[s]."

26.     The relevant definition of the term "matter" is "a material substance of a particular kind or for a particular purpose <*vegetable matter*>." Merriam Webster Online Dictionary.

27.     The inclusion of the term "matter" in subheading 3204.19.35 clearly contemplates that products within the scope of the subheading would be beta-carotene or other carotenoid colorants of a particular kind or for a particular purpose. For,

> When an article is in character or function something other than as described by a specific provision in the tariff schedule, either more limited or more diversified, and the difference is significant, it cannot be classified within that provision. Robert Bosch Corp. v. United States, 63 Cust. Ct. 96, 103-04, C.D. 3881 (1969) (citations omitted). If the difference is merely an improvement or amplification, and the essential character of the merchandise is preserved or only incidentally altered, the rule is that an eo nomine designation will include all forms of the article, absent contrary legislative intent or commercial designation. Id. at 104 (citing Nootka Packing Co. v. United States, 22 C.C.P.A. 464, T.D. 47,464 (1935)).

Nestle Refrigerated Food Co. v. United States, 18 C.I.T. 661, 664 (1994).

28.     Because the subheading 3204.19.35 includes "beta carotene...coloring matter" and Lucarotin® 1% is a beta-carotene coloring matter, Lucarotin® 1% is classifiable in subheading 3204.19.35.[7]

_____

[6] "A canon of construction holding that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it." Black's Law Dictionary at 1087 (8th ed. 1999).

[7] Plaintiff has argued that Lucarotin® 1% is a form of beta-carotene and is entitled to duty-free treatment because subheading 3204.19.35 grants duty-free treatment for products that are included in the Pharmaceutical Appendix to the Tariff Schedule, symbolized by "K."

The application of the Pharmaceutical Appendix is different from that of the Chemical Appendix, and it should not be construed so broadly. While both Appendices state in their notes that products "by whatever name known" should fall under their respective scopes, the intent

15

29.    If only pure, crystalline beta-carotene could be classified under subheading 3204.19.35, as Defendant suggests, the subheading would be an empty provision since pure beta-carotene cannot be used as a colorant without processing.

30.    BASF produces synthetic beta-carotene, but there is no market for crystalline, pure beta-carotene as a colorant.

31.    Lucarotin® 1% is marketed and sold by BASF and bought by customers as a beta-carotene colorant.

---

behind their existence appears to be different.  In Ciba-Geigy Corp. v. United States, 178 F. Supp.2d 1336 (CIT 2001), the court discusses in great detail the legislative history of the Chemical Appendix.

No such detailed legislative history exists for the Pharmaceutical Appendix which was added to U.S. law pursuant to the pharmaceutical agreement of the General Agreement of Tariffs and Trade ("GATT"). Uruguay Rounds Agreements Act ("URAA"), Pub. L. 103-465, 108 Stat. 4809 (1994); see Proclamation No. 6763, 60 Fed. Reg. 1007 (Jan. 4, 1995); Pharmaceutical Tables 1 and 3 of the HTSUS, 60 Fed. Reg. 20,558 (April 26, 1995).  During the Uruguay Round negotiations, the then GATT contracting parties, including the United States, European Union, Japan, Canada, and others, agreed to eliminate tariffs on thousands of pharmaceutical products. This so called "zero-for-zero initiative" included an immediate elimination of duties on certain pharmaceutical products as well as reviews by the signatories at least once every three years to identify more products which could be covered by this duty reduction program. The products which were to obtain duty-free treatment based on this "zero-for-zero" program are identified in the Pharmaceutical Appendix for duty-free treatment.  The basis for the Pharmaceutical Appendix is thus not a protectionist one; however, since the products identified in the Pharmaceutical Appendix for duty-free treatment were based on specific, ongoing negotiations, see section 111(b) of the URAA,  the list should be construed narrowly as "the conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government." United States v. Pink, 315 U.S. 203, 223-23, 62 S. Ct. 552, 86 L. Ed. 796 (1942).

Lucarotin® 1% is a mixture and a *beta-carotene coloring matter*: it is neither pure beta-carotene nor a form of beta-carotene. See Customs Headquarters Ruling Letter 961704, dated Oct. 14, 1998 ("A product is not entitled to duty-free treatment unless it is actually listed in the Pharmaceutical Appendix.  Despite having each of [the] component compounds [of the product at issue] included in the Appendix, this merchandise, a mixture . . . , is not itself listed in the Pharmaceutical Appendix. Customs has no statutory authority to expand the Pharmaceutical Appendix.").  Lucarotin® 1%  is not "used in the prevention, diagnosis, alleviation, treatment, or cure of disease in humans or animals," which the ITC identifies as a pharmaceutical or "drug." See Advice Concerning the Addition of Certain Pharmaceutical Products and Chemical Intermediates to the Pharmaceutical Appendix to the Harmonized Tariff Schedule of the United States, USITC Pub. 3167, at 3 (April 1999).  Lucarotin® 1% is thus not eligible for duty-free treatment under the Pharmaceutical Appendix.

16

32. Congress is presumed to have known that the correct meaning of a term in a tariff provision is the common meaning understood in trade and commerce, see Schott Optical Glass, Inc. v. United States, 612 F.2d 1283, 1285 (C.C.P.A. 1979), and that the legislative purpose is expressed by the ordinary meaning of the words used, see Richards v. United States, 369 U.S. 1, 9, 82 S. Ct. 585, 7 L. Ed. 2d 492 (1962).

33. A product's actual use cannot be ignored in determining whether it falls within an *eo nomine* tariff provision. See United States v. Quon Quon Co., 46 C.C.P.A. 70, 73 (1959).

34. Lucarotin® 1% therefore must be classified as a beta-carotene coloring matter under subheading 3204.19.35 to effectuate Congress' intent. See Len-Ron Mfg.Co. v. United States, 24 CIT 948, 961, *aff'd* 334 F.3d 1304 (Fed. Cir. 2003).

35. The Harmonized Commodity Description and Coding System Explanatory Notes ("Explanatory Notes")[8], provide further support for classifying Lucarotin® 1% under HTSUS subheading 3204.19.35.

36. Explanatory Note (I)(A) to Subheading 32.04 states that the Heading "Synthetic Organic Colouring Matter, Whether or not Chemically Defined; Preparations as Specified in Note 3 to this Chapter Based on Synthetic Coloring Matter"

applies, *inter alia*, to:

> (A) . . . [s]ynthetic organic colouring matter diluted with substances which have no dyeing properties (e.g., anyhdrous sodium sulphate, sodium chloride, dextrin, starch) to decrease or standardise their colouring power. The addition of small quantities of surface-active products to encourage penetration and fixation of the dye does not affect the classification of colouring matter.

37. The components of Lucarotin® 1% apart from the beta-carotene itself comprise the types of dilutants mentioned by the Explanatory Notes. The d-glucose and maltodextrin are carbohydrate fillers similar to "starch." The ascorbyl palmitate and dl-alpha-tocopherol serve to stabilize the beta-carotene and the tricalcium phosphate is an anticaking agent. The Explanatory Notes suggest that these sorts of ingredients do not affect the classification of products like Lucarotin® 1%.

---

[8] The Explanatory Notes are persuasive, but not binding on this court. H.R. Conf. Rep. No. 100-576, 100th Cong., 2d Sess. 549 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1582; see Bauer Nike Hockey USA, Inc. v. United States, 393 F.3d 1246, 1250 (Fed. Cir. 2004); Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994).

38.     If any of these Conclusions of Law shall more properly be Findings of Fact, they shall be deemed to be so.




                                        /s/     Evan J. Wallach, Judge


Dated: June 13, 2005
        New York, New York

18